# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: COUNTRYWIDE FINANCIAL CORP. MORTGAGE MARKETING AND SALES PRACTICES LITIGATION,<br><br>THIS DOCUMENT RELATES TO:<br><br>*Dorothy Peralta, et al. v. Countrywide Home Loans, Inc., et al.*, Case No. 10cv0257 DMS (WMC) | CASE NO. 08md1988 DMS (WMC)<br>10cv0257 DMS (WMC)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**[Docket Nos. 439, 127]** |

This matter comes before the Court on Plaintiff's motion for class certification. Defendants Countrywide Home Loans, Inc. and Countrywide Bank, FSB filed an opposition to the motion, and Plaintiff submitted a reply. David Arbogast, Chumahan Bowen, Steven Bronson and J. Mark Moore appeared and argued on behalf of Plaintiff, and Thomas Hefferon, Brooks Brown and Robert Bader appeared and argued on behalf of Defendants. After hearing oral argument, the Court allowed supplemental briefing on Plaintiff's motions to strike and objections to Defendants' evidence, which the parties have now submitted. Having carefully considered the pleadings and arguments of counsel, the Court denies the motion.

///

**I.**

**BACKGROUND**

This case is part of a multi-district litigation regarding individuals and several business entities involved in mortgage lending across the country. This case, in particular, which involves California residents only, has a unique procedural history going back to May 25, 2007. On that date, Steven Bigverde, along with Carrie Shaw and Aaron K. Dunn, filed a Complaint against Countrywide Bank FSB, Countrywide Home Loans, Inc., Countrywide Financial Corporation and Treasury Bank, N.A. in the United States District Court for the Central District of California. On August 6, 2007, the defendants filed a motion to dismiss that Complaint. The plaintiffs responded by filing a First Amended Complaint on August 28, 2007, which the defendants moved to dismiss. On January 7, 2008, the court granted that motion and gave the plaintiffs leave to file a Second Amended Complaint, which they did. The Second Amended Complaint added Dorothy Peralta as a plaintiff, and dropped Ms. Shaw and Mr. Dunn as plaintiffs. The defendants moved to dismiss the Second Amended Complaint, which the court granted. The court also gave the plaintiffs leave to file a Third Amended Complaint, which they did. The defendants thereafter moved to dismiss the Third Amended Complaint, after which the plaintiffs voluntarily dismissed their case.

Twenty-nine days later, on June 2, 2009, the plaintiffs filed another case in Alameda Superior Court. They thereafter filed a First Amended Class Action Complaint ("FAC") on June 18, 2009. The FAC named Bigverde and Peralta as plaintiffs, and also named an additional plaintiff, James Moscoso. On July 17, 2009, the defendants removed the case to the United States District Court for the Northern District of California. The plaintiffs thereafter moved to remand the case, and the defendants moved for dismissal and to transfer the case to the Central District. The court denied the motion to remand, and granted the motion to transfer. The plaintiffs submitted a request to appeal the remand decision to the Ninth Circuit, which granted the request. While that request was pending, the case was transferred to this Court pursuant to an order from the Judicial Panel on Multidistrict Litigation.

After the transfer to this Court, the parties filed supplemental briefs in support of and in opposition to the motion to dismiss. This Court stayed its decision on the motion pending a ruling from the Ninth Circuit on the remand issue. The Ninth Circuit issued its ruling on April 15, 2010, in

which it vacated the order granting the request to appeal and dismissed the appeal as improvidently granted. Thereafter, this Court issued an order granting in part and denying in part Defendants' motion to dismiss. Specifically, the Court granted the motion as to the claims of Plaintiffs Bigverde and Moscoso, but denied the motion as to certain claims of Plaintiff Peralta.

In the FAC, Plaintiff Peralta alleges she entered into an Option Adjustable Rate Mortgage ("ARM") loan with Defendants. Plaintiff alleges the Notes for these loans are based on a "teaser" interest rate, which ranges from 1% to 3%, and the payment schedule for the first two to five years of the loan listed in the Truth in Lending Disclosure Statements ("TILDS") is based upon the "teaser" interest rate, even though the "teaser" interest rate adjusts after only one month. (FAC ¶17.) Plaintiff alleges that after the interest rate adjustment, the monthly payment listed in the TILDS is no longer sufficient to pay the interest on the loan, resulting in negative amortization. (*Id.* ¶18.) Plaintiff alleges Defendants knew negative amortization was "certain" to occur, but they failed to disclose that fact to Plaintiff. (*Id.* ¶¶18-20.) Plaintiff alleges that by the time she learned her loans would negatively amortize, she was locked into the loan by a "draconian" prepayment penalty. (*Id.* ¶24.)

These allegations serve as the factual basis for Plaintiff's remaining legal claim, which alleges Defendants engaged in unlawful and unfair business practices in violation of California Business & Professions Code § 17200. In support of this claim, Plaintiff relies on the loan documents and the accompanying required disclosure statements. (*Id.* ¶¶1, 31.) Plaintiff asserts these documents were uniform, which makes her case "ideally suited for class-wide adjudication[.]" (Mem. of P. & A. in Supp. of Mot. at 1.) Accordingly, she seeks certification of the following class:

> All California residents who, from May 25, 2003 through the date that notice is mailed to Class Members, entered into an Option Adjustable Rate Mortgage ("Option ARM") loan from Countrywide Home Loans, Inc., which loan had the following characteristics: (i) the yearly numerical interest rate listed on page one of the Note is 3.0% or less; (ii) in the section entitled "Interest," the Promissory Note states that this rate "*may*" instead of "*will*" or "*shall*" change (e.g., "The interest rate I will pay *may* change"); (iii) the yearly numerical interest rate listed on page one of the Note was only effective through the due date for the first monthly payment and then adjusted to a rate which is the sum of an "index" and "margin"; and (iv) the Note does not contain any statement that paying the amount listed as the "initial monthly payment(s)" will definitely result in negative amortization or deferred interest. Excluded from the Class are Defendants' employees, officers, directors, agents, representatives, and their family members, as well as the Court and its officers, employees, and relatives.

(*Id.* at 2.)

Despite Plaintiff's attempt to confine this case to the loan documents, Defendants argue the Court will have to consider all of the disclosures made by the brokers and loan officers to the individual borrowers, including other written disclosures and oral discussions. Defendants submitted substantial evidence to support this position, including numerous declarations from independent mortgage brokers and Defendants' former or current loan officers about their practices in handling these transactions. (*See* Decl. of Fred Arnold in Supp. of Opp'n to Mot. ("Arnold Decl."); Decl. of Christopher John Bianchi in Supp. of Opp'n to Mot. ("Bianchi Decl."); Decl. of Al Hensling in Supp. of Opp'n to Mot. ("Hensling Decl."); Decl. of Fred Itzkovics in Supp. of Opp'n to Mot. ("Itzkovics Decl."); Decl. of Robert Nicholson in Supp. of Opp'n to Mot. ("Nicholson Decl."); Decl. of Carl Streicher in Supp. of Opp'n to Mot. ("Streicher Decl."); Decl. of George D. Tribble in Supp. of Opp'n to Mot. ("Tribble Decl."); Decl. of Thomas Walters in Supp. of Opp'n to Mot. ("Walters Decl."); Decl. of Leanna Wooten in Supp. of Opp'n to Mot. ("Wooten Decl."). Generally, these Declarations explain that these transactions involve more than just the exchange of written loan documents. Rather, these transactions involve the exchange of numerous other written documents, and more importantly, oral discussions about the features of the various loan products, interest rate options, negative amortization, and other issues of interest and specific to individual borrowers.[1]

///

///

///

---

[1] Plaintiff moves to strike these Declarations from the record on the ground that Defendants failed to identify the Declarants in a timely manner. Defendants respond that they were simply following Plaintiff's lead in refusing to identify arguments and evidence in support of class certification until the motion was filed. Defendants also state they provided supplemental discovery responses identifying these Declarants, and any failure to disclose them earlier was harmless. The Court agrees with Defendants, and thus denies Plaintiff's motion to strike these Declarations.

Plaintiff also raises evidentiary objections to the individual Declarations, however, none of those objections is persuasive. First, Plaintiff objects to the Declarations on the ground they are irrelevant. Specifically, Plaintiff asserts the Declarations do not address the loans at issue in this case, *i.e.*, Option ARM loans with a one-month "teaser" rate, but rather are addressed to Option ARM loans in general. However, Defendants explain that the overwhelming majority of Option ARM loans sold in California during the relevant time period were one-month "teaser" loans. (*See* Decl. of Davis Lee in Supp. of Opp'n to Mot. ¶¶ 5-6.) Accordingly, the Court overrules Plaintiff's relevancy objection. Plaintiff also objects to certain Declarations on the grounds they violate the best evidence rule, lack foundation and are unreliable. The Court finds these objections lack merit, and thus overrules those objections, as well.

## II.

## DISCUSSION

**A.     Legal Standard**

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc.* v. *Dukes,* ___U.S.___, 131 S.Ct. 2541, 2550 (2011) (citing *Califano* v. *Yamasaki,* 442 U.S. 682, 700-01 (1979)). To qualify for the exception to individual litigation, the party seeking class certification must provide facts sufficient to satisfy the requirements of Federal Rules of Civil Procedure 23(a) and (b). *Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304, 1308-09 (9th Cir. 1977).

Federal Rule of Civil Procedure 23(a) sets out four requirements for class certification – numerosity, commonality, typicality, and adequacy of representation.[2] A showing that these requirements are met, however, does not warrant class certification. Plaintiff also must show that one of the requirements of Rule 23(b) is met. Here, Plaintiff relies on Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The district court must conduct a rigorous analysis to determine whether the prerequisites of Rule 23 have been met. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982). It is a well-recognized precept that "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 (1978) (quoting *Mercantile Nat'l Bank v. Langdeau,* 371 U.S. 555, 558 (1963)). However, "[a]lthough some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on the merits at the class certification stage." *Moore v. Hughes Helicopters, Inc.,* 708 F.2d

---

[2] Fed. R. Civ. P. 23(a) provides: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

475, 480 (9th Cir. 1983) (citation omitted). Rather, the court's review of the merits should be limited to those aspects relevant to making the certification decision on an informed basis. *See* Fed. R. Civ. P. 23 advisory committee notes. If a court is not fully satisfied that the requirements of Rules 23(a) and (b) have been met, certification should be refused. *Falcon,* 457 U.S. at 161.

**B.    Rule 23(a)**

Rule 23(a), and its prerequisites for class certification – numerosity, commonality, typicality, and adequacy of representation – are addressed in turn.

1.    Numerosity

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *Staton v. Boeing Co.,* 327 F.3d 938, 953 (9th Cir. 2003). The plaintiff need not state the exact number of potential class members; nor is a specific minimum number required. *Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, 448 (N.D. Cal. 1994). Rather, whether joinder is impracticable depends on the facts and circumstances of each case. *Id.* Here, Plaintiff states, and Defendants do not dispute, that there are nearly 60,000 potential class members. A class of this magnitude satisfies the first requirement of Rule 23(a).

2.    Commonality

The second element of Rule 23(a) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement is met through the existence of a "common contention" that is of "such a nature that it is capable of classwide resolution[.]" *Dukes,* 131 S.Ct. at 2551. As summarized by the Supreme Court:

> "What matters to class certification ... is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of commons answers."

*Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L. Rev. 97, 132 (2009)).

In this case, Plaintiff lists a number of legal and factual issues that she asserts are common to the class. (*See* Mem. of P. & A. in Supp. of Mot. at 11-12.) In particular, Plaintiff states each member of the proposed class obtained an Option ARM loan directly from Countrywide, and each member of

the proposed class received "standardized loan documents that all failed to disclose the same material information." (*Id.* at 11.) While these issues may be common to the class and subject to common proof, Defendants raise other arguments in support of their position that the commonality element is not satisfied here. As discussed in more detail below, the Court agrees with Defendants that there are dissimilarities in the proposed class that "impede the generation of common answers apt to drive the resolution of the litigation." *Dukes,* 131 S.Ct. at 2551. Thus, Plaintiff has failed to establish commonality under Rule 23(a).

### 3. Typicality

The next requirement of Rule 23(a) is typicality, which focuses on the relationship of facts and issues between the class and its representative. "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir. 1998). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal quotation marks omitted).

Here, Plaintiff asserts her claim is typical of the claims of the members of the proposed class because their claims rely on a uniform set of documents. Plaintiff also contends she is typical of the proposed class members because they all purchased the same loan product. Defendants argue Plaintiff is not typical of the proposed class members because she obtained her loan from a broker. However, that fact does not render Plaintiff atypical. Most of the members of the proposed class obtained their loans through a broker, and the remainder obtained their loans through a loan officer employed by Countrywide. (*See* Decl. of Kathleen Keener in Supp. of Opp'n to Mot. ¶ 6.) Thus, Plaintiff has satisfied the typicality requirement.

### 4. Adequacy of Representation

The final requirement of Rule 23(a) is adequacy. Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is grounded in constitutional due process concerns; "absent class members

must be afforded adequate representation before entry of judgment which binds them." *Hanlon,* 150 F.3d at 1020 (citing *Hansberry v. Lee,* 311 U.S. 32, 42-43 (1940)). In reviewing this issue, courts must resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.* (citing *Lerwill v. lnflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir. 1978)). The named plaintiffs and their counsel must have sufficient "zeal and competence" to protect the interests of the rest of the class. *Fendler v. Westgate-California Corp.,* 527 F.2d 1168, 1170 (9th Cir. 1975).

Plaintiff here has demonstrated the absence of any conflict between herself and her counsel and the members of the proposed class. Plaintiff has also demonstrated that she and her counsel will vigorously prosecute the case on behalf of the class. Accordingly, Plaintiff has satisfied the adequacy requirement.

**C.    Rule 23(b)**

The next issue is whether Plaintiff has shown that at least one of the requirements of Rule 23(b) is met. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614-15 (1997). In this case, Plaintiff asserts she has met the requirements of Rule 23(b)(3). Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon,* 150 F.3d at 1022 (internal quotations omitted). Rule 23(b)(3), as discussed, calls for two separate inquiries: (1) do issues of fact or law common to the class "predominate" over issues unique to individual class members, and (2) is the proposed class action "superior" to other methods available for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). In adding the requirements of predominance and superiority to the qualifications for class certification, "the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem,* 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3) advisory committee notes).

A "central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'" *Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935,

944 (9th Cir. 2009) (quoting *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1189 (9th Cir. 2001)). Thus, courts must determine whether common issues constitute such a significant aspect of the action that "there is a clear justification for handling the dispute on a representative rather than on an individual basis." 7A Charles Alan Wright, *et al., Federal Practice and Procedure* § 1778 (3d ed. 2005). The predominance inquiry under Rule 23(b) is rigorous, *Amchem,* 521 U.S. at 624, as it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623.

In this case, the only claim remaining is Plaintiff's claim under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. This statute prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]" Cal. Bus. & Prof. Code § 17200. Here, Plaintiff alleges Defendants' conduct was both unlawful and unfair in that Defendants, among other things, violated California Civil Code §§ 1572 (Actual Fraud), 1573 (Constructive Fraud), and 1710 (Deceit) by engaging in the referenced fraudulent practices. (FAC ¶ 91.) To state a claim under California's UCL, "'it is necessary only to show that members of the public are likely to be deceived'" by the defendant's conduct. *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009)). The focus of the UCL – a consumer protection law – is on the defendant's conduct, and not on the plaintiff's damages. *Id.* Indeed, the UCL provides only for equitable relief, such as injunctive relief and restitution in light of the statute's overarching purpose of protecting the general public from unscrupulous business practices. *Id.* Accordingly, "'relief under the UCL is available without individualized proof of deception, reliance and injury.'" *Id.* (quoting *Tobacco II*, 46 Cal. 4th at 320).

Plaintiff argues that in light of this standard common issues predominate because her claim rests on uniform written disclosures that were likely to deceive class members. (Mem. of P. & A. in Supp. of Mot. at 15.) In support of this argument, Plaintiff relies on several cases. First, she relies on *Yokoyama v. Midland National Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010). That case involved a claim under Hawaii's Deceptive Practices Act, a counterpart to California's UCL. There, the plaintiffs alleged that representations in the defendant's sales and marketing brochures were misleading and deceptive in that the defendant "represents that its annuities protect its clients from

the risks of the stock market and that Midland fails to include in its documentation facts necessary to inform prospective purchasers of the true risks, possible detriments, and unsuitability of Midland's long-term annuities for seniors." *Id.* at 1090. The district court denied class certification on the ground that individual issues of reliance would predominate over any common issues. The Ninth Circuit disagreed with the district court's interpretation of Hawaii law, and instead found that reliance could be shown by an objective, reasonable person standard. *Id.* at 1093. In light of that legal error, the Ninth Circuit reversed the district court's denial of class certification.

Plaintiff likens her case to *Yokoyama*, specifically that portion of the case that describes the plaintiff's claim as one that relies exclusively on written materials. However, there is a critical distinction between the facts of *Yokoyama* and the facts of this case: In *Yokoyama*, the defendant "obligate[d] its brokers, with respect to each sale, ... to certify that nothing was said that is inconsistent with Midland's brochures and disclosure forms." *Id.* at 1090. In contrast, Defendants here imposed no such obligation on their loan officers or the independent brokers. On the contrary, Defendants assert their brokers and loan officers "provided the supposedly omitted information to each borrower in oral communications or in other loan documents that varied from borrower to borrower." (Opp'n to Mot. at 11) (citations omitted).

For instance, Fred Arnold, a mortgage broker who placed loans with Countrywide, states:

> In explaining POA loans to my borrowers, my practice was to describe, in detail, the interest rate change and negative amortization features of the product, as well as the costs of the product as compared to other adjustable and fixed-rate products. In my experience, good originators offered more than one loan product for the borrower to consider, and when I offered a POA loan, I explained the monthly payments options available to borrower-clients in the early years of a POA loan, including the options to make a minimum payment, interest-only payment, and/or 15-year or 30-year amortizing payment, and the negative amortization consequences of choosing the minimum payment option. I found that it was critical to explain the negative amortization feature, and I always explained that a loan will negatively amortize if the borrower made the minimum payment.

(Arnold Decl. ¶ 7.) Leanna Wooten, a former loan originator with Countrywide's Consumer Markets Division ("CMD"), also states:

> When customers requested a POA loan, my usual practice, and Countrywide's policy as I understood it, was to provide customers with detailed information, both oral and written, about the loan's terms and features as well as about how the loan worked. For example, I carefully explained to each borrower that the initial, low interest rate on the loan would last for only a short time - usually one to three months and then increase to the sum of the set margin and variable index. I also explained to each customer that,

> after the expiration of the initial, low rate, the interest rate would continue to be linked to a set margin and variable index that would determine whether the rate increased or decreased during the life of the loan. As part of this explanation, I made it a point to inform each borrower of the maximum and minimum interest rate under the POA loan, as well as that increases in the interest amounts due on the loan that would flow from increases in the interest rate. ... I also explained the monthly payment options available to the borrower in a POA loan, how the payment options worked and, in particular, the negative amortization consequences using the minimum payment option.

(Wooten Decl. ¶¶ 5-6.)

Plaintiff ignores this evidence, and the distinction it creates between the facts of her case and the facts of *Yokoyama*. However, that distinction takes Plaintiff's case outside the bounds of *Yokoyama*, and severely limits, if not eliminates, *Yokoyama*'s application to this case.[3]

Plaintiff also cites two cases that arise out of circumstances identical to those underlying this case, *i.e.*, cases involving "teaser" interest rates with resulting negative amortization if the minimum payment was made by the borrower, to support her argument for a finding of predominance. *See Lymburner v. U.S. Financial Funds, Inc.*, 263 F.R.D. 534 (N.D. Cal. 2010); *Plascencia v. Lending 1st Mortgage*, 259 F.R.D. 437 (N.D. Cal. 2009). These cases, however, were decided before *Wal-Mart*, 131 S.Ct. at 2557-61 (recognizing defendant's right to raise individual affirmative defenses), and *Stearns*, 655 F.3d at 1020 (citing *Wal-Mart* and cautioning predominance may be lacking in UCL claim where no cohesion among class members exists "because they were exposed to quite disparate information from various representatives of the defendant.") To be sure, a mortgage loan transaction involves numerous documents, many of which are standardized, and most of which contain confusing

---

[3] Many of the other cases Plaintiff relies on are distinguishable for the same reason. *See Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718 (9th Cir. 2007) (affirming certification of class because claim "based on uniform disclosures made by AWS to all its consumers[.]"); *Schramm v. JPMorgan Chase Bank, N.A.*, No. LA CV09-09442 JAK (FFMx), 2011 WL 5034663, at *4 (C.D. Cal. Oct. 19, 2011) (finding predominance requirement met where UCL claim was based on "same allegedly misleading language."); *In re National Western Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 664 (S.D. Cal. 2010) (finding predominance requirement met where claims based on uniform, written materials); *Kingsbury v. U.S. Greenfiber, LLC*, No. CV 08-00151 AHM (JTLx), 2011 WL 2619231, at *6 (C.D. Cal. May 23, 2011) (finding predominance requirement satisfied where claim rests on omission of material information from standard purchase agreement); *Abels v. JBC Legal Group, P.C.*, 227 F.R.D. 541, 544-45 (N.D. Cal. 2005) (commonality requirement met where claim arises out of standard letter sent to each member of proposed class); *Randolph v. Crown Asset Management, LLC*, 254 F.R.D. 513, 519-20 (N.D. Ill. 2008) (finding predominance requirement met where "claims are based on standardized form complaints and supporting affidavits."); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37-38 (E.D.N.Y. 2008) (finding predominance requirement satisfied where case involved use of form contracts); *Wisneski v. Nationwide Collections, Inc.*, 227 F.R.D. 259, 260 (E.D. Pa. 2004) (same as *Abels*).

1  and arcane language, but – as established here – the transaction also may involve discussions, both
2  oral and written, between the individual borrower and his or her broker or loan officer over features
3  of the loan (such as negative amortization) later questioned in ensuing litigation.  The courts in
4  *Lymburner* and *Plascencia* expressly declined to address the impact, if any, of such discussions with
5  class borrowers in the context of a UCL claim: "The 'individual circumstances of each class member's
6  loan need not be examined because the class members are not required to prove reliance and
7  damage.'"  *Lymburner*, 263 F.R.D. at 543 (quoting *Plascencia*, 259 F.R.D. at 448).  But as *Stearns*
8  makes clear, while class members need not prove individualized deception, reliance and injury, the
9  Court must consider whether disclosures to class members were made and, if so, whether such
10 disclosures: (a) tend to defeat the claim that the common conduct attributed to the defendant is likely
11 to deceive the entire class, and (b) are so numerous and individualized that they defeat commonality.

12       In this case, Defendants have come forward with evidence that reflects the individualized
13 nature of the loan purchase and refinance transactions in question.  That evidence demonstrates that
14 these transactions varied from borrower to borrower.  (*See* Arnold Decl. ¶ 6 ("My conversations with
15 POA loan borrowers varied from transaction to transaction because every consumer is different and
16 every transaction is different."); Bianchi Decl. ¶ 5 (stating discussions with borrowers differed "based
17 on borrower needs and preferences."); Hensling Decl. ¶¶ 12-13 (stating communications with
18 borrowers varied from transaction to transaction)).  In light of this evidence, the transactions at issue
19 here lack the "cohesion" necessary for a finding of predominance.  *See Stearns*, 655 F.3d at 1020 (no
20 predominance where there is "no cohesion among the members because they were exposed to quite
21 disparate information from various representatives of the defendant.")

22       The facts of this case are akin to the facts of *Kaldenbach v. Mutual of Omaha Life Ins. Co.*, 178
23 Cal. App. 4th 830 (2009), and *Fairbanks v. Farmers New World Life Ins. Co.*, 197 Cal. App. 4th 544
24 (2011).  In *Kaldenbach*, the plaintiff brought an action against Mutual of Omaha (Mutual) concerning
25 the sale of a so-called "vanishing premium" life insurance policy, in which the plaintiff was led to
26 believe that after making four annual premium payments ($12,648 total), the cash reserves on his
27 policy – earned through high rates of interest on the cash accumulation of his premium payments –
28 would be sufficient to cover his life insurance until the maturity date of the policy.  *Id.* at 835-36.

Eight years after making his last premium payment, however, Mutual notified the plaintiff that his cash reserves were insufficient and if he did not start making premium payments again his policy would lapse. *Id.* at 836. The plaintiff alleged for himself and on behalf of putative class members that Mutual provided uniform sales materials and training methods to its agents that allowed them to mislead customers into believing that a low cost of actual insurance could be invested by Mutual with a sufficient return to cover future premium payments until maturity of the policy, when in fact (given higher costs of mortality and declining interest rates) the policy could not perform as represented. *Id.* Mutual denied the allegations, and came forward with evidence that it had no control over the training materials read or sales methods used by the independent sales agents. *Id.* at 839. Each sales presentation, according to Mutual, "'was left up to the agent's sole discretion and would vary from agent to agent and prospect to prospect,' depending on the purchaser's needs." *Id.*

In affirming the trial court's denial of class certification under the UCL, the *Kaldenbach* court held:

> [T]he determination of what business practices were allegedly unfair turns on individual issues. ...[T]he viability of a UCL claim would turn on inquiry into the practices employed by any given independent agent – such as ... what materials, disclosures, representations, and explanations were given to any given purchaser.

*Id.* at 849-50.

Like *Kaldenbach*, in *Fairbanks*, the plaintiffs brought a claim against Farmers for violation of the UCL "in connection with Farmers' marketing and sale of universal life insurance policies." 197 Cal. App. 4th at 546. Specifically, the plaintiffs alleged "that Farmers designed and marketed its ... policies in such a way that the premiums paid would be inadequate to keep the policies in effect until maturity, resulting in the underfunding of the policies and their eventual lapse." *Id.* at 550. The trial court denied the plaintiffs' motion for class certification on the ground that common issues did not predominate. In particular, the court found predominance lacking because "(1) the representations made to prospective policyholders were not common; and (2) whether any particular misrepresentation was material was also not common, as resolution of the issue would depend on the particular needs of the prospective policyholder." *Id.* at 559.

The court of appeal agreed with those findings, and thus affirmed the denial of class certification. Relying on *Kaldenbach*, the *Fairbanks* court stated, "a class action cannot proceed for a fraudulent business practice under the UCL when it cannot be established that the defendant engaged in uniform conduct likely to mislead the entire class." *Id.* at 562 (citations omitted). Like Plaintiff here, the plaintiffs in *Fairbanks* attempted to defeat that finding by relying on the policy language, which the court stated was "indisputably amenable to common proof." *Id.* at 564. However, the court went on to state it would be "impossible to consider the language of the policies without considering the information conveyed by the Farmers agents in the process of selling them." *Id.* The court also agreed with the trial court's finding that materiality was not subject to common proof. Although the court acknowledged that materiality was subject to an objective standard, it found "the issue is nonetheless subject to individual proof under the circumstances of this case." *Id.* at 565. In support of that finding, the court noted that individuals purchase different types of life insurance for different reasons, "including: the ability to skip payments and not lose coverage; the ability to increase or decrease FFUL premiums as financial circumstances require; the ability to change the death benefit without obtaining a new policy; and the ability to accrue tax-deferred interest." *Id.* The court also cited evidence that "roughly half of the FFUL policyholders surveyed would have purchased the policy even if they had been told that the premiums were not guaranteed to keep the policy in force to maturity." *Id.*

Here, as in *Kaldenbach* and *Fairbanks*, the determination of whether Defendants' business practices were likely to deceive turns on numerous individual issues. Plaintiff must show "uniform conduct likely to mislead the entire class" to satisfy the predominance requirement. *Kaldenbach*, 178 Cal. App. 4th at 850. Like the plaintiffs in *Fairbanks*, Plaintiff here attempts to meet that showing by relying exclusively on the written documents, but that approach ignores the nature of the transaction as one that involves not only the exchange of written documents but also considerable oral and written discussions between the individual borrowers and their brokers.[4]

---

[4] Defendants also point out that Countrywide made its loans through multiple separate divisions. "Each division operated separately, offered varying loan products, and interacted with prospective borrowers differently." (Opp'n to Mot. at 4.) Plaintiff's loan was made through the Wholesale Lending Division ("WLD"), which used independent brokers. Thus, Plaintiff and "the majority of California borrowers who obtained their POA loans through WLD during the putative

Furthermore, Plaintiff has not shown that the materiality element of her UCL claim is subject to proof by common evidence. Indeed, Plaintiff fails to provide any evidence to support this argument. Plaintiff simply assumes that the information allegedly omitted in standard loan documents, *i.e.,* an "ephemeral teaser rate" which would "increase sharply after one month" and thus, "guarantee negative amortization" if the minimum payment was made, was "objectively material" to the entire class. (*See* Reply Br., at 1.) Defendants, however, submitted evidence that members of the proposed class were situated differently. (*See* Hensling Decl. ¶ 13; Streicher Decl. ¶ 6; Walters Decl. ¶ 7; Wooten Decl. ¶ 3.) For instance, some borrowers:

> wanted POAs and other loan products with lower interest rates in the initial years of the loan in order to save money. Other borrowers ... expressed that they had difficulty meeting their existing mortgage payments and wanted to refinance to reduce their interest rate and monthly payments. Other borrowers wanted to reduce the length of the loan from a 30-year loan to a 20- or 15-year loan. Other borrowers wanted POA and other loan products with lower interest rates and payments in the early years of the loan because they intended to own the property, as a primary residence or investment, for a short time and/or wanted additional resources to make improvements to the property after the purchase. Other borrowers wanted POA or other loan products with lower initial rates and payments because they anticipated future increases in income or property values and such products allowed them to purchase a more expensive home than, for example, 30 or 40-year fixed rate products. Other borrowers wanted the monthly payment flexibility of POA loans because of fluctuation in their income or household expenses from month-to-month. Other borrowers were planning to relocate and wanted to reduce their interest rate and use the property as a rental property rather than as their principal residence.

(Wooten Decl. ¶ 3.) The evidence submitted by Defendants illustrates that numerous class members may have been unconcerned with negative amortization given plans, for example, to sell their property at later time in a then-rising housing market. Under these circumstances, the element of materiality is not subject to common proof on a classwide basis. *See Fairbanks*, 197 Cal. App. 4th at 565 (stating materiality not subject to common proof where reasons for purchasing insurance varied).

Plaintiff argues *Kaldenbach*, and by extension, *Fairbanks*, are inapplicable to the facts of this case because in those cases "there was no uniform practice committed by defendant, whereas here there is." (Reply at 10 n.13.) However, simply repeating the refrain that this case involves "uniform

---

class period had no communications at all with [Countrywide]. This is because they dealt exclusively with independent mortgage brokers, over whom [Countrywide] had no control, in the loan selection, application and origination process." (*Id.*) (citing *Arnold Decl.*, ¶ 4-5; *Garrison* Decl., ¶ 3-8; *Hensling* Decl., ¶ 9-11; *Itzkovics* Decl., ¶ 14-16; *Tribble* Decl., ¶ 6, 12-13.)

1  conduct" does not make it so. Although the written documents at issue here may be uniform, or at
2  least similar enough that they are subject to common proof, it is impossible to consider the written
3  documents without also considering the oral and written discussions between the borrowers and the
4  brokers. Those discussions are not subject to common proof, but rather raise individual issues that
5  predominate over any other common issues in this case. Accordingly, the predominance requirement
6  is not met on Plaintiff's claim under the UCL. Absent a showing of predominance, Plaintiff is not
7  entitled to class certification.[5]

## III.

## CONCLUSION

For the reasons set out above, Plaintiff's motion for class certification is denied.

**IT IS SO ORDERED**.

DATED:  December 16, 2011

_____
HON. DANA M. SABRAW
United States District Judge

---

[5] Because Plaintiff's motion is denied on these grounds, the Court declines to address the balance of Defendants' arguments.